254 F.3d 387 (2nd Cir. 2001)
 ROBERT MANNING, On behalf of himself and on behalf of Blue Cross of California, National Heritage Insurance Company, Empire Medicare Services and DN Cigna/Medicare, Plaintiff-Appellant,
v.
UTILITIES MUTUAL INSURANCE CO., INC.; NIAGARA MOHWAK POWER CO.; JOHN DOE, name is fictitious; RICHARD ROE, Defendants-Appellees.
 Docket No. 00-9219
August Term, 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: April 6, 2001
Decided: June 20, 2001
 
 Appellant Robert Manning appeals from a judgment of the District Court for the Southern District of New York (Casey, J.), dated August 31, 2000, denying plaintiff's motion for reconsideration of the court's September 30, 1999 memorandum and order dismissing the plaintiff's fraud claim and granting defendant's motion for reconsideration, dismissing plaintiff's claim under the Medicaid Secondary Payer Act. Affirmed in part, reversed in part, vacated and remanded for further proceedings.[Copyrighted Material Omitted]
 KENNETH F. MCCALLION, Goodkind, Labaton, Rudoff & Sucharow, New York, NY (Rajan Sharma, on the brief), for Appellant Robert Manning.
 KENNETH PASQUALE, Stroock & Stroock & Lavan LLP, New York, NY (Heidi Balk, on the brief), for Appellee Niagara Mohawk Power Co..
 STUART C. LEVENE, Ford, Marrin, Esposito, Witmeyer & Gleser, LLP, New York, NY (David A. Beke, on the brief), for Appellee Utilities Mutual Insurance Co..
 Before: KEARSE, CABRANES & KATZMANN, Circuit Judges.
 KATZMANN, Circuit Judge:
 
 I. INTRODUCTION
 
 1
 Plaintiff-Appellant Robert Manning ("Manning" or "plaintiff") appeals from a judgment of the District Court for the Southern District of New York (Casey, J.), dated August 31, 2000, denying plaintiff's motion for reconsideration of the court's September 30, 1999 memorandum and order dismissing the plaintiff's fraud claim and granting defendant's motion for reconsideration, dismissing plaintiff's claim under the Medicaid Secondary Payer Act ("MSP"). For the reasons stated below, we affirm the decision to dismiss plaintiff's fraud claim, but reverse the decision to dismiss plaintiff's claim under the MSP. We hold that the six-year statute of limitations applicable to private rights of action under the False Claims Act should be applied to private rights of action under the MSP, and therefore plaintiff's MSP claim is not time barred. We further hold that plaintiff should be permitted an opportunity to amend his complaint to allege more sufficiently a claim for bad faith refusal to pay insurance benefits. Therefore, we vacate the judgment and remand the case for further proceedings consistent with this opinion.
 
 II. FACTS & PROCEDURAL HISTORY[1]
 
 2
 On February 27, 1962, Manning, a 25-year-old father of two, was rendered a quadriplegic when he fell from a utility pole in upstate New York while working for Defendant Niagara Mohawk Power Co. ("NMP"). NMP used as its workers' compensation carrier the Utilities Mutual Insurance Co. ("UMI") (collectively "defendants"). From 1962 until 1968, UMI paid plaintiff workers' compensation benefits, which included a weekly stipend and plaintiff's medical expenses and the costs of around-the-clock nursing care. In 1968, plaintiff obtained a judgment against New York Telephone Company, from whose utility pole he had fallen, and recovered a net sum of approximately $388,000. As allowed by New York State Workers' Compensation Law ("WCL"), UMI both received a lien for the workers' compensation benefits already provided and stopped paying benefits while plaintiff's expenses were covered by the recovery from New York Telephone Company.
 
 
 3
 In 1973, having exhausted his recovery from New York Telephone Company, plaintiff requested that defendants resume his benefits under the WCL. Defendants refused, asserting that plaintiff had not established that his 1968 recovery had been exhausted. When plaintiff became financially unable to pay for his medical costs, Medicare, a health insurance program sponsored mainly by the federal government, began to cover some of his medical expenses. According to plaintiff's Amended Complaint, the defendants knew that his tort recovery had been depleted, and the failure to resume his benefits for the next 24 years was in bad faith and designed to perpetrate a fraud against plaintiff and the Medicare system.
 
 
 4
 In order to obtain resumption of his workers' compensation benefits, plaintiff initiated litigation in 1979 before the New York State Workers' Compensation Board ("WCB"). Despite being ordered several times by the WCB to resume paying benefits to the plaintiff, defendants continued to litigate the case, appealing to the New York State appellate courts on three occasions. See Manning v. Niagara Mohawk Power Corp., 501 N.Y.S.2d 218 (3d Dep't 1986); Manning v. Niagara Mohawk Power Corp., 603 N.Y.S. 2d 214 (3d Dep't 1993); Manning v. Niagara Mohawk Power Corp., 650 N.Y.S. 2d 431 (3d Dep't 1996). Defendants lost each appeal, yet continued to deny plaintiff benefits. The New York Attorney General's office became involved in the case in 1997, writing several letters to the defendants which informed them of their legal duty to resume paying plaintiff benefits.
 
 
 5
 In July 1997, just two months after Manning's case was profiled in The New York Times as the longest running dispute before the WCB, the parties settled the dispute by stipulation, with $1.9 million being paid to the plaintiff. Under the stipulation, plaintiff released all claims within the exclusive jurisdiction of the WCB. However, plaintiff expressly reserved the right to litigate claims pursuant to federal or state law that were not within the WCB's exclusive jurisdiction.
 
 
 6
 On July 7, 1998, plaintiff filed the complaint giving rise to this appeal in the Southern District of New York, and soon thereafter filed an Amended Complaint. Count One of the Amended Complaint seeks damages of two times $876,321, the cost of plaintiff's medical care since 1992, which plaintiff alleges should have been paid by defendants but instead was paid by Medicare. Plaintiff asserts that he is entitled to these damages pursuant to the MSP, 42 U.S.C. § 1395y(b) (2000). Count Two of plaintiff's Amended Complaint demands compensatory and punitive damages of at least $10 million for defendants' bad faith failure to pay for his medical expenses in a timely manner. The Amended Complaint alleges that defendants' fraudulent refusal to pay for his medical costs caused him physical harm, emotional distress, and resulted in his receiving inferior health care. Soon after the Amended Complaint was filed, defendants each separately submitted motions to dismiss and for summary judgment. With regard to plaintiff's MSP claim, defendants asserted it was time barred.
 
 
 7
 Ruling on defendants' motions, the district court dismissed plaintiff's fraud claim for failure to plead reliance on a material misrepresentation by defendants. However, the court denied defendants' motion to dismiss plaintiff's MSP claim, finding that the claim was timely under the applicable three-year statute of limitations. See Manning v. Utilities Mut. Ins. Co., No. 98 Civ. 4790 (RCC), 1999 WL 782569 (S.D.N.Y. Sept. 30, 1999) ("Manning I"). Both parties moved for reconsideration, and the district court ruled for the defendants on both issues, affirming the dismissal of the fraud claim and dismissing plaintiff's MSP claim as time-barred. See Manning v. Utilities Mut. Ins. Co., No. 98 Civ. 4790 (RCC), 2000 WL 1234591 (S.D.N.Y. Aug. 31, 2000) ("Manning II").
 
 III. STANDARD OF REVIEW
 
 8
 As noted, defendants submitted motions seeking dismissal of the Amended Complaint under both Rule 12(b) and Rule 56 of the Federal Rules of Civil Procedure. As we discuss below in section IV(B)(1) of this opinion, we view the district court's decision as one dismissing plaintiff's fraud claim under Rule 12(b)(6). We review de novo decisions on both motions to dismiss and motions for summary judgment. See Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000) (motion to dismiss); Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000) (motion for summary judgment).
 
 IV. DISCUSSION
 
 9
 A. The district court's decision to dismiss plaintiff's MSP claim on statute-of-limitations grounds is reversed.
 
 
 10
 On motion for reconsideration, the district court dismissed plaintiff's claim under the MSP. Before proceeding with our review of that decision, a short background of the MSP is warranted. The MSP designates certain insurers, such as employers and the employers' workers' compensation carriers, as primary payers for medical services, and relegates Medicare to the role of secondary payer. See 42 U.S.C. § 1395y(b)(2)(A). Thus, Medicare will not pay for expenses that should be covered by the primary payers; if Medicare pays, it will be subject to a right of recoupment from the primary payer. See id. § 1395(b)(2)(B). To encourage compliance with these requirements, Congress has authorized a private cause of action and double damages against entities designated as primary payers that fail to pay for medical costs for which they were responsible, which are borne in fact by Medicare. See id. § 1395y(b)(3)(A).[2] The statute also provides for a cause of action for the government to recover the money paid by Medicare; alternatively, the government is subrogated to the right of the private citizen for the recovery of such funds. See id. § 1395y(b)(2)(B)(ii) & (iii).[3]
 
 
 11
 Plaintiff's Amended Complaint seeks damages of two times $876,321 in medical costs he alleges should have been assumed by defendants but instead was paid by Medicare. As noted, the district court dismissed this claim on statute-of-limitations grounds. See Manning II, 2000 WL 1234591, at *2-*3. Federal courts must establish the appropriate statute of limitations for private actions brought under the MSP, as Congress has not specified which limitations period applies. See United Paperworkers Int'l Union v. Specialty Paperboard, Inc., 999 F.2d 51, 52-53 (2d Cir. 1993) (federal law determines which limitations period to apply when federal statute does not provide for one). Other than this case, only one federal court has wrestled with identifying the limitations period for private actions brought under the MSP. See Brooks v. Blue Cross & Blue Shield of Fla., No. 95-405-CIV, 1995 WL 931702, at *18-*19 (S.D. Fla. Sept. 22, 1995), aff'd on other grounds, 116 F.3d 1364 (11th Cir. 1997).
 
 
 12
 Both the Southern District of Florida in Brooks and the district court in this case decided that the proper limitations period for MSP actions is established by borrowing the respective state limitations period "most closely analogous" to the MSP statute. See Brooks, 1995 WL 931702, at *18-*19; Manning I, 1999 WL 782569, at *1; Manning II, 2000 WL 1234591, at *2 (citing Reed v. United Transp. Union, 488 U.S. 319, 323 (1989)). Neither district court devoted much analysis to this issue or the possibility that an exception to the rule of borrowing a state limitations period would apply to the MSP.[4] Plaintiff asserts that because there exists a more analogous federal statute, the Federal False Claims Act, the limitations period from that analogous federal statute should apply to private actions brought under the MSP. Ultimately, although it is a close question, we agree with plaintiff.
 
 
 13
 1. Legal background for identifying the appropriate limitations period.
 
 
 14
 A well-defined process exists for federal courts to establish limitations periods for causes of action created by federal statute which do not specify such. In Reed, the Supreme Court stated that when Congress does not supply a statute of limitations to a federally created statutory cause of action:
 
 
 15
 We have generally concluded that Congress intended that the courts apply the most closely analogous statute of limitations under state law.
 
 
 16
 ****
 
 
 17
 State legislatures do not devise their limitations periods with national interests in mind, however, and it is the duty of the federal courts to assure that the importation of state law will not frustrate or interfere with the implementation of national policies. Thus, on the assumption that Congress would not choose to adopt state limitations rules at odds with the purpose or operation of federal substantive law, we have recognized a closely circumscribed exception to the general rule that statutes of limitation are to be borrowed from state law. We decline to borrow a state statute of limitations only when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking. This is a narrow exception to the general rule.
 
 
 18
 Reed, 488 U.S. at 323-24 (internal quotation marks, alteration, and citations omitted).
 
 
 19
 This court reviewed the law in Phelan v. Local 305, 973 F.2d 1050, 1058 (2d Cir. 1992), cert. denied, 507 U.S. 972 (1993):
 
 
 20
 Where, as here, the federal statute under which a plaintiff brings an action does not provide a specific limitations period, federal courts must determine the appropriate limitations period according to federal law. [citation omitted]. This normally entails borrowing the most closely analogous state statute of limitations. See, e.g., DelCostello [v. IBT], 462 U.S. [151], 158 [(1983)]. However, as has become increasingly apparent in the last several years, see Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991) (borrowing federal securities limitation to create uniformity); Agency Holding Corp. v. Malley Duff & Associates, 483 U.S. 143 (1987) (borrowing antitrust limitation in RICO case); DelCostello, 462 U.S. at 151 (borrowing federal limitation in labor case), state limitations periods do not necessarily complement federal statutes and borrowing them sometimes proves unwise. Cf. Communications Workers of America v. Western Electric Co., 860 F.2d 1137, 1139 (1st Cir. 1988) ("[T]he glance in the direction of the state law cupboard should not be an automatic or reflexive one.").
 
 
 21
 Id. (parallel citations omitted).
 
 
 22
 Thus, in sum, according to Reed, Phelan and subsequent cases, the test is as follows: "we borrow federal rather than state limitations periods where (1) a federal rule of limitations clearly provides a closer analogy than state alternatives, and (2) the federal policies at stake and the practicalities of the litigation render the federal limitation a significantly more appropriate vehicle for interstitial lawmaking." Phelan, 973 F.2d at 1058 (internal quotation marks omitted); accord United Paperworkers Int'l Union, 999 F.2d at 53. And although the exception is a narrow one, this court has noted that there are a number of cases in which the Supreme Court has have found the exception applicable.[5] See Phelan, 973 F.2d at 1058.
 
 
 23
 2. Similarities between private actions brought under the MSP and the False Claims Act.
 
 
 24
 Today, we find that the strict requirements of the Reed/Phelan exception are met, and hold that the six-year statute of limitations applicable to private rights of action under the False Claims Act ("FCA"), see 31 U.S.C. § 3731(b)(1) (2000), should be applied to private rights of action under the MSP. The FCA authorizes suits by both the government and private citizens to recover monies erroneously paid to those who defraud the government by submitting or collecting falsified claims. The FCA is similar to the MSP in that both statutes allow individual citizens, as well as the government, to sue in order to right an economic wrong done to the government. Compare id. § 3730(a)-(b), with 42 U.S.C. § 1395y(b)(3)(A). Both the FCA and MSP allow for a multiplier of damages to enable the government to recover its funds while also providing a financial incentive for private citizens to bring such suits. Compare 31 U.S.C. § 3729(a)(7), with 42 U.S.C. § 1395y(b)(2)(B)(ii). Both statutes thus create "private attorneys general" by authorizing private citizens to receive part of the recovery. Compare 31 U.S.C. § 3730(d), with 42 U.S.C. § 1395y(b)(3)(A). The Supreme Court has found significant the fact that two federal statutes create "private attorneys general" when determining whether to apply the limitations period from one statute to the other. See Agency Holding Corp. v. Malley Duff & Assocs. Inc., 483 U.S. 143, 151 (1987) (declining to borrow state limitations period and instead borrowing the federal antitrust limitations period for civil RICO suits, based in part on fact that both federal statutes created "private attorneys general").
 
 
 25
 In sum, there are important similarities between the FCA and MSP statutes and the private rights of action created therein. The similarity of the actions brought under these two statutes is further suggested by the fact that courts have recognized FCA claims against insurers based on violations of the MSP. See Cooper v. Blue Cross & Blue Shield of Fla., Inc., 19 F.3d 562, 564-66 (11th Cir. 1994); United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co., 721 F. Supp. 1247, 1248-49 (S.D. Fla. 1989). This suggests that the two statutes seek to provide a remedy for similar injuries.
 
 
 26
 On the other hand, we note procedural differences between actions brought under the MSP and those brought under the FCA. The MSP creates a private right of action for individuals whose medical bills are improperly denied by insurers and instead paid by Medicare, and the government is subrogated to the right of the private citizen for the recovery of such funds. See 42 U.S.C. § 1395y(b)(3)(A) & (b)(2)(B)(iii). Under the FCA, a private citizen can sue to recover on a claim falsely submitted and paid by the United States, but such action is a relator action brought in the name of the government. See 31 U.S.C. § 3730(b). Unlike in MSP actions, the government must be allowed to participate in FCA actions filed by private individuals, and, if the government so desires, to take over the prosecution of such actions. See id. § 3730(b)(2) & (4). Furthermore, the government can have private FCA suits dismissed even over the objection of the citizen who filed the action, as long as notice and an opportunity for a hearing are provided to the individual citizen. See id. § 3730(c)(2)(A).
 
 
 27
 Despite these procedural differences, the FCA "clearly provides a closer analogy than [New York] state alternatives," and the first part of the Reed/Phelan test is therefore satisfied. Phelan, 973 F.2d at 1058. We have not found, and the parties have not pointed us to, any New York or California cause of action which more closely resembles private actions under the MSP.[6] See Ceres Partners v. GEL Assocs., 918 F.2d 349, 357 (2d Cir. 1990) (borrowing a federal statute of limitations may be warranted where the federal claim does not match any state-law claims). We therefore move to consider the second step of the Reed/Phelan test, inquiring whether "the federal policies at stake and the practicalities of the litigation render the federal limitation a significantly more appropriate vehicle for interstitial lawmaking." Phelan, 973 F.2d at 1058 (internal quotation marks omitted).
 
 
 28
 3. Difficulties in applying a state statute of limitations.
 
 
 29
 In considering this somewhat cryptic test, courts have looked at several factors, including whether the cause of action encompasses a wide range of situations and injuries, and whether many of the resulting lawsuits will involve the laws of multiple States. The presence of either or both these factors has been found to indicate that a uniform federal limitations period is desirable in that it significantly furthers the interests of predictability and reducing judicial and litigation costs. See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 357 (1991) (plurality opinion) (where federal cause of action encompasses many topics, such that a single statute of limitations cannot be applied within one jurisdiction without difficulty, one standard limitations period to be applied nationally is desirable); Agency Holding Corp., 483 U.S. at 153-54 (because civil RICO actions often involve interstate disputes, a federal statute of limitations is appropriate); Ceres Partners, 918 F.2d at 357 (finding that federal limitations period should apply to certain private rights of action judicially implied from securities laws, noting that "selection of a uniform federal limitations period may be warranted (1) where the statutory claim in question covers a multiplicity of types of actions, leading to the possible application of a number of different types of state statutes of limitations, [or] (3) where the challenged action is multistate in nature, perhaps leading to forum shopping and inordinate litigation expense"); but see United Paperworkers, 999 F.2d at 56 (unlike suits brought under 42 U.S.C. § 1983 or the civil RICO provisions, the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq., gives rise to only one kind of action, thus "neither predictability nor judicial economy would suffer" from borrowing a state limitations period).
 
 
 30
 The private cause of action created by the MSP raises some of the same concerns that have previously led the Supreme Court and this court to borrow federal limitations periods. Although MSP actions may not often encompass many topics and subtopics, interstate litigation is certainly likely between plaintiffs in one state and the corporate headquarters of insurance companies in another. As in this case, such interstate litigation will often involve state borrowing statutes. To discourage forum shopping by plaintiffs looking for the longest limitations periods, borrowing statutes generally provide that, when an action is brought by a non-resident of the state on a cause of action that accrues outside the state, the forum state will apply either the limitations period of the state in which the action accrued or that of the forum state, whichever is shorter. See, e.g., N.Y.C.P.L.R. § 202. See also, Jack B. Weinstein, Harold L. Korn, Arthur R. Miller, 1 New York Civil Practice (2000) ¶ 202.01 (describing purposes and workings of New York's borrowing statute). When borrowing statutes apply, they generally result in short limitations periods because the shorter of the two possible periods will apply.
 
 
 31
 Given that the MSP statute creates a private right of action to help the government recover monies erroneously paid by Medicare, there is a federal interest in having a longer statute of limitations apply to MSP actions.[7] We glean this intent from the text of the statute, which explicitly seeks to recover funds paid by Medicare, see 42 U.S.C. § 1395y(b)(2), and find some support in the legislative history.
 
 
 32
 The history of the MSP legislation is consistent with our view that the private right of action was created to save money for the Medicare system. The Omnibus Reconciliation Act of 1980 first created the MSP. See Pub.L. No. 96 499, § 953, 94 Stat. 2599 (1980). That act established that Medicare was only secondarily responsible for the medical expenses of those covered by Medicare who were also covered by certain other forms of insurance. See id. The intent of Congress in shifting the burden of primary coverage from Medicare to certain private insurance carriers was to place the burden where it could best be absorbed, especially considering that these insurers had already assumed such burdens - and received the benefits - in contracts with the insured. "[M]edicare has served to relieve private insurers of obligations to pay the costs of medical care in cases where there would otherwise be liability under the private insurance contract." H.R. Rep. No. 96 1167, reprinted in 1980 U.S.C.C.A.N. 5526, 5752. The MSP, as amended by the Deficit Reduction Act of 1984, provided the government with an explicit statutory right of recovery for Medicare overpayments against those designated as primary payers. See Pub.L. No. 98 369, § 2344(a)(3), 99 Stat. 494 (1984); see generally Provident Life & Accident Ins. Co. v. United States, 740 F. Supp. 492, 497-500 (E.D. Tenn. 1990) (reviewing the history of the MSP enactments and amendments through 1985). The MSP was again amended in 1986 to add a private right of action to recover funds paid by Medicare when other insurance plans were legally required to pay as primary payers. See Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9319 (1986), 100 Stat. 1874.[8]
 
 
 33
 Notably, the FCA was also amended in 1986 to allow for increased citizen participation, including more citizen lawsuits, to assist the government in exposing fraud and recovering erroneously issued payments. See Pub. L. 99-562, § 3 (1986), 100 Stat. 3153. As a Senate report noted, the "overall intent in amending the qui tam section of the False Claims Act is to encourage more private enforcement suits." S. Rep. No. 99 345 (1986) reprinted in 1986 U.S.C.C.A.N. 5266, 5288 89; see also United States ex rel. Williams v. NEC Corp., 931 F.2d 1493, 1497 (11th Cir. 1991) (reviewing 1986 amendments and finding that they were intended to increase private citizen involvement in exposing fraud against the government); United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1154 (3d Cir. 1991) (same). The fact that the FCA and MSP were both amended in 1986 to allow for increased citizen participation in helping the government recover funds erroneously paid is a further argument for applying the FCA's six-year limitations period to private actions brought under the MSP.
 
 
 34
 Additionally, it does not strike us as correct that the government's interest in recovery of wrongly paid Medicare funds should be dependent on an insured's state of residence or an insurance company's headquarters. The federal interest in recovering monies erroneously paid by Medicare is better served by uniformly adopting the six-year limitations period applicable to private claims brought pursuant to the FCA. See 31 U.S.C. 3731(b)(1). We also note that such a holding will bring into conformity the limitations period applicable to private rights of action with the limitations period which has been held applicable to government actions under the MSP. See Provident Life & Accident Ins. Co.,740 F. Supp. at 505 (general six-year statute of limitations applicable to actions by the government, set forth in 28 U.S.C. § 2415(a) (1990), applies to MSP actions brought by the government), accord United States v. Blue Cross & Blue Shield of Mich., 726 F. Supp. 1517, 1522 (E.D. Mich. 1989).
 
 
 35
 Moreover, a holding that the appropriate statute of limitations is to be governed by looking to state law would likely lead to complex litigations over which state limitations period to apply. As in this case, a MSP claimant may move between states during the limitations period, raising difficult choice-of-law questions. Assuming for the moment that a federal limitations period is inapplicable, this case presents an extremely complicated puzzle to determine which state limitations period applies. We would be forced to ascertain who the truly injured party is (choosing between plaintiff and Medicare), where the cause of action accrued, whether to apply the New York borrowing statute, and which state limitations period applies. All of these are difficult questions involving both state and federal law. Indeed, on defendants' motion for reconsideration, the district court reversed its prior decision and held that New York's borrowing statute should apply. See Manning II, 2000 WL 1234591, at *3.[9] This case is an excellent example of why a uniform federal statute of limitations for all MSP actions would be preferable in terms of predictability and reducing judicial and litigation costs.
 
 
 36
 In conclusion, for the reasons described in the foregoing analysis, we find that "the federal policies at stake and the practicalities of the litigation render the federal limitation a significantly more appropriate vehicle for interstitial lawmaking." Phelan, 973 F.2d at 1058 (internal quotation marks omitted). We therefore hold that the two steps of the Reed/Phelan test are met and that this case fits within the "closely circumscribed" exception of Reed and its progeny. The six-year statute of limitations applicable to FCA claims applies to private actions brought under the MSP. Because plaintiff's complaint, filed in July 1998, seeks damages associated with defendants' refusal to pay for medical expenses incurred after 1992, his MSP claim is timely and must be allowed to proceed.
 
 
 37
 A. The district court's decision to dismiss plaintiff's claim of fraud is affirmed.
 
 
 38
 Count Two of plaintiff's Amended Complaint demands compensatory and punitive damages of at least $10 million for defendants' bad faith refusal to pay for his medical expenses and other workers' compensation benefits in a timely manner. The Amended Complaint alleges that defendants' fraudulent refusal to pay for his health costs caused him physical harm, emotional distress, and that he suffered inferior health care. The district court's first decision dismissed Count Two and the dismissal was affirmed on motion for reconsideration. See Manning I, 1999 WL 782569, at *4-*5; Manning II, 2000 WL 1234591 at *3-*4. We affirm the district court's decision to dismiss plaintiff's fraud claim. However, we also find that the plaintiff should be allowed an opportunity to amend his complaint to allege more sufficiently a claim against defendants for their bad faith refusal to pay him insurance benefits. Before explaining these holdings, we must first ascertain the point at which the plaintiff's fraud claim was dismissed.
 
 
 39
 1. The fraud claim was dismissed on a motion to dismiss.
 
 
 40
 There is some confusion over whether the district court dismissed the claim on UMI's summary judgment motion or motion to dismiss. Plaintiff's Amended Complaint was served on October 6, 1998. On October 15, 1998, UMI moved for an order under Fed. R. Civ. P. Rules 12(b)(1), 12(b)(6) and 56, dismissing Count II of plaintiff's Amended Complaint. Within days of UMI's motion, NMP submitted a motion seeking dismissal of Count I of plaintiff's Amended Complaint under the same federal rules. The defendants specifically adopted each other's motions. Discovery between the parties then continued for some time. On September 30, 1999, the district court submitted its first decision. See Manning I, 1999 WL 782569.
 
 
 41
 Manning I begins by stating "before the Court are [defendants'] motions for summary judgment." Id. at *1. This statement, in addition to the fact that a certain amount of discovery had already proceeded between the parties, would normally mean that this court would review the district court's decision under summary judgment principles. However, the language of the district court's decision suggests that the court dismissed plaintiff's fraud claim under a motion to dismiss, not a motion for summary judgment. First, the court stated that it would avoid tackling the factual disputes presented by the parties:
 
 
 42
 To establish whether Defendants' conduct reached the level set forth in Walker [v. Shledon, 233 N.Y.S.2d 488 (N.Y. 1961)] and Rocanova [v. Equitable Life Assur. Soc'y., 612 N.Y.S.2d 339 (N.Y. 1994)] would require much factual determination. However, the Court need not reach a conclusion on this before determining whether Plaintiff has sufficiently set forth an independent actionable tort claim against Defendants, the first requirement of the Rocanova analysis.
 
 
 43
 Manning I, 1999 WL 782569, at *4 (emphasis added).
 
 
 44
 The district court then proceeded to examine and find inadequate the face of the pleadings.
 
 The court decided:
 
 45
 To satisfy [Fed. R. Civ. P.] Rule 9(b), Plaintiff's pleadings must contain sufficient detail to give Defendants notice of the transactions intended to be proven and the elements of the claims. Plaintiff failed to plead reliance on the misrepresentation of a material fact by Defendants; reliance and knowing misrepresentation are both essential elements of fraud.
 
 
 46
 Id. (emphasis added) (internal quotation marks and citation omitted).
 
 
 47
 The district court's clear focus on the pleadings and not the evidence submitted, persuades us to review the dismissal of the plaintiff's fraud claim under a motion to dismiss standard.
 
 
 48
 2. Plaintiff failed to state a fraud claim under New York law.
 
 
 49
 Taking as true all of the allegations contained in plaintiff's complaint and drawing all inferences in his favor, we nevertheless hold that plaintiff's fraud claim was properly dismissed. In order to properly explain our holding, we must provide some background into relevant New York law.
 
 
 50
 New York courts have created a regime in which an insured's claims against a first-party insurer are generally considered under a contract theory, and the damages available are limited to those awarded under contract. See generally New York Univ. v. Continental Ins. Co., 639 N.Y.S.2d 283, 287-90 (N.Y. 1995); Rocanova, 612 N.Y.S.2d at 342-44. In this case, the plaintiff cannot recover contractual damages from defendants because such claims are within the exclusive jurisdiction of the WCB and were settled by stipulation between the parties.
 
 
 51
 However, New York courts have identified a limited number of instances where an insured can recover damages in excess of contract damages, that is, tort damages, from his or her first-party insurer. Under Rocanova, the awarding of compensatory and punitive damages in such cases requires a two step analysis. First, the defendant's conduct must be "actionable as an independent tort for which compensatory damages are ordinarily available." Rocanova, 612 N.Y.S.2d at 343. Second, in order to state a claim for punitive damages, a claimant must allege conduct which is "aimed at the public generally," involves "a fraud evincing a high degree of moral turpitude" and demonstrates "such wanton dishonesty as to imply a criminal indifference to civil obligations." Id. (internal quotation marks and citation omitted); see also New York Univ., 639 N.Y.S.2d at 287 (summarizing Rocanova test).[10]
 
 
 52
 The district court identified the Rocanova test and properly focused on whether Count Two of plaintiff's Amended Complaint set forth an actionable tort outside the contract. See Manning I, 1999 WL 782569, at *4. We begin with the same question.
 
 
 53
 Tort damages are available in New York where, inter alia, "a[n] [insurer] engages in conduct outside the contract but intended to defeat the contract." New York Univ., 639 N.Y.S.2d at 288, accord Logan v. Empire Blue Cross & Blue Shield, 714 N.Y.S.2d 119, 123 (2d Dep't 2000); see also Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996) (under New York law, a fraud claim associated with a breach of contract can be sustained and tort damages can be recovered where plaintiff can "demonstrate a fraudulent misrepresentation collateral or extraneous to the contract").
 
 
 54
 Based on these cases, plaintiff's fraud claim can proceed if it sufficiently alleges that defendants engaged in fraud "collateral" or "outside the contract," which was "intended to defeat the contract." See New York Univ., 639 N.Y.S.2d at 288; Bridgestone/Firestone, 98 F.3d at 20. Under New York law, the essential elements of a fraud claim include "representation of a material existing fact, falsity, scienter, deception, and injury." New York Univ., 639 N.Y.S.2d at 289 (internal quotation marks omitted); see Bridgestone/Firestone, 98 F.3d at 19 (to prove fraud under New York law, plaintiff must show "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance") (internal quotation marks omitted).
 
 
 55
 The district court dismissed plaintiff's claim because it found that his complaint failed to allege "reliance on the misrepresentation of a material fact." Manning I, 1999 WL 782569, at *4. We agree. Reviewing the Amended Complaint in the instant case, we discern two possible allegations of misrepresentations by the defendants. The first is that, beginning in 1973, the defendants agreed to resume payment for plaintiff's medical care but failed to do so. See Joint-Appendix at 43-44, #15-16. Such a misrepresentation, which is merely a statement of intent to perform under the contract, cannot constitute fraud in New York.[11] See Bridgestone/Firestone, 98 F.3d at 19-20 (statements of intent to perform under the contract are not sufficient to sustain a fraud claim in New York).
 
 
 56
 Plaintiff's Amended Complaint can also be read to allege a second misrepresentation. Beginning in 1974, one of NMP's employees repeatedly told plaintiff that, before plaintiff's benefits could be resumed, defendants would require an "accounting" to ensure that plaintiff had exhausted the funds he received in settlement of his negligence suit. See Joint Appendix at 44-45, #19. The complaint states that plaintiff provided defendants with all the information necessary to conduct such an accounting, but defendants continued to use this "accounting excuse" for 23 years to deny plaintiff workers' compensation benefits. Id.
 
 
 57
 We now analyze such an allegation under the test for a fraud claim set forth in Bridgestone/Firestone, 98 F.3d at 19. We assume without deciding that the Amended Complaint sufficiently alleges that defendants made a material representation which was intended to defraud the plaintiff. Even so, fatal to the fraud claim is plaintiff's failure to allege reasonable reliance on such misrepresentations and that he suffered damages as a result. Nowhere in plaintiff's complaint does he allege that he reasonably and detrimentally relied on this "accounting excuse" employed by the defendants. While plaintiff's briefs to this court argue that he detrimentally relied on this representation in that he both provided financial information to defendants and that he had his own accountant compile an accounting, such allegations were not made in the complaint as is required. Even if we were to consider the factual allegations presented in plaintiff's briefs, we would find that, as a matter of law, plaintiff's reliance on the accounting excuse for so many years was not reasonable. In order to survive the six-year statute of limitations applied to his fraud cause of action in New York, see N.Y.C.P.L.R. § 213.8, plaintiff would have to prove that he continued to rely on such representations through July 1992, or that he only discovered defendants' fraudulent use of the "accounting excuse" after July 1992.[12] We simply cannot accept that plaintiff reasonably relied on this excuse for 18 years before bringing a fraud claim against the defendants.
 
 
 58
 C. Plaintiff should be allowed an opportunity to replead to allege more sufficiently a claim for defendants' bad faith refusal to pay benefits.
 
 
 59
 Although we affirm the dismissal of plaintiff's fraud claim, we believe that Count Two of the Amended Complaint may be broad enough to encompass a claim against defendants based on their bad faith refusal to pay benefits. We note that the Amended Complaint contains allegations that could support a cause of action for bad faith refusal to pay. For example, the Amended Complaint details how defendants' twenty-four-year refusal to pay workers' compensation benefits was in bad faith because defendants knew that plaintiff was eligible for such benefits. Plaintiff's briefs also recount how defendants refused to pay despite repeated orders from the WCB and New York appellate courts to do so. Such refusal is allegedly even more egregious in the face of plaintiff's severe disability and financial hardship. These allegations and arguments of bad faith seem to be distinct from the material misrepresentations detailed in the Amended Complaint which form the basis of the fraud claim.
 
 
 60
 Although plaintiff failed properly to identify and allege a claim for bad faith refusal to pay benefits in the Amended Complaint, rule 15(a) requires that such "leave [to replead] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); see A.N. Wight v. BankAmerica Corp., 219 F.3d 79, 91 (2d Cir. 2000). The interests of justice noted by Rule 15(a) strongly favor allowing plaintiff an opportunity to replead his complaint to attempt to specifically and sufficiently allege a claim against defendants for their bad faith refusal to pay benefits.
 
 
 61
 This court does not decide whether a claim for bad faith failure to pay benefits can be maintained in this case or even whether New York law recognizes such a cause of action. We believe that such decisions must be made after plaintiff amends his complaint to flesh out the factual allegations behind this claim and both parties are given the opportunity to brief such questions.[13]
 
 V. CONCLUSION
 
 62
 In sum, we reverse the district court's dismissal of plaintiff's claim under the MSP, but affirm the dismissal of the fraud claim. We also hold that plaintiff should be permitted an opportunity to replead in order to allege more sufficiently a claim based on defendants' bad faith refusal to pay benefits. The case is therefore remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 NOTES:
 
 
 [1]
 As we construe the district court's dismissal to be one pursuant to defendants' motion to dismiss, see discussion infra at IV-B(1), we take as true all of the allegations contained in plaintiff's complaint and draw all inferences in favor of the plaintiff. See IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1058 (2d Cir. 1993). Dismissal is appropriate only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief.'" Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000) (quoting Conley v. Gibson, 355 U.S. 41, 45 46 (1957)).
 
 
 [2]
 The statute provides, in relevant part:
 There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with such paragraphs (1) and (2)(A).
 42 U.S.C. § 1395y(b)(3)(A) (2000).
 
 
 [3]
 The statute provides, in relevant part:
 (ii)Action by United States
 In order to recover payment under this subchapter for such an item or service, the United States may bring an action against any entity which is required or responsible (directly, as a third party administrator, or otherwise) to make payment with respect to such item or service (or any portion thereof) under a primary plan (and may, in accordance with paragraph (3)(A) collect double damages against that entity), or against any other entity (including any physician or provider) that has received payment from that entity with respect to the item or service,.
 (iii) Subrogation Rights
 The United States shall be subrogated (to the extent of payment made under this subchapter for such an item or service) to any right under this subsection of an individual or any other entity to payment with respect to such item or service under a primary plan.
 42 U.S.C. § 1395y(b)(2)(B)(ii) & (iii) (2000).
 
 
 [4]
 The district court in this case stated:
 Although Plaintiff correctly indicates that a Court must apply a federal timeliness rule when the federal rule presents a closer analogy than the available state statute, this is a narrow exception to the general rule. Here, the Federal False Claims Act, which is intended to prevent the submission of false claims to Medicare, is not sufficiently analogous to the MSP, which creates a private cause of action when a primary plan fails to provide a primary payment.
 Manning II, 2000 WL 1234591, at *2 (citations omitted).
 
 
 [5]
 See also Ceres Partners v. GEL Assocs., 918 F.2d 349, 357 (2d Cir. 1990) (noting the "Supreme Court['s] inroads into the traditional practice of borrowing from state law").
 
 
 [6]
 Assuming New York's borrowing statute is applicable, we would be forced to compare the relevant California statute of limitations with that of New York. See discussion of borrowing statutes infra at § IV(A)(3).
 
 
 [7]
 We also note that a longer, predictable statute of limitations will act as a deterrent to those primary payers who are tempted to allow Medicare to pay for costs that the insurers would otherwise cover.
 
 
 [8]
 The applicable MSP provision was apparently added to the 1986 Omnibus Act at the House-Senate Conference as a result of a Senate Amendment. See H.R. Conf. Rep. No. 99-1012 (1986), reprinted in 1986 U.S.C.C.A.N. 3607, 3965. Neither the statute nor the Conference report specifically explains Congress's intent in adding the private right of action to the MSP. However, when Senator David Durenberger, Republican of Minnesota, introduced President Reagan's Medicare proposals for 1986, which included adding a private right of action to enforce the MSP, it was introduced as the President's "health care cost reduction proposals." See Statements of Introduced Bills & Joint Resolutions, 132 Cong. Rec. S.11930-01 (Statement of Sen. Durenberger) (August 15, 1986) (page references unavailable). This statement supports the intent we glean from the language of the statute -- to save the government money by giving private citizens incentives to recover funds erroneously paid by Medicare.
 We also note that while the 1986 MSP amendments created a private right of action against workers' compensation plans, automobile, liability and no fault insurance plans, and certain group health plans, amendments adopted in 1989 further expanded the pool of defendants subject to citizen suits. Compare Omnibus Reconciliation Act of 1986, Pub. L. No. 99-509, § 9319 (1986), with Omnibus Reconciliation Act of 1989, Pub. L. No. 101-239 § 6202(b) (1989), 103 Stat. 2106. One district court stated that the 1989 amendments added the private right of action to the MSP, which is an understandable error given the language of those amendments. See Brooks v. Blue Cross & Blue Shield of Fla., No. 95-405-CIV, 1995 WL 931702, at *12 (S.D. Fla. Sept. 22, 1995). However, the private right of action was actually added in 1986. See supra.
 
 
 [9]
 Because we hold that a federal limitations period applies to plaintiff's claim under the MSP, we have no occasion to pass on the propriety of the district court's application of the New York borrowing statute. We do recognize that the district court was faced with a difficult task.
 
 
 [10]
 We are somewhat unclear from reading Rocanova and New York University whether a plaintiff must satisfy both steps of this test in order to state a claim for compensatory damages, or whether such a claim would be satisfied merely by alleging that the insurer engaged in an actionable tort outside the contract. We believe, but are not certain, that the second step of the Rocanova test is necessary only to determine whether a claim for punitive damages can be sustained. Ultimately, given our conclusion that the plaintiff's fraud claim did not state an actionable tort, we merely note this issue.
 
 
 [11]
 We note that such a statement, to the extent it is found to evidence an acknowledgment by defendants of their duty to provide benefits, may contribute to plaintiff's claim of bad faith failure to pay. See infra § IV(C).
 
 
 [12]
 New York's six year statute of limitations for fraud claims is a "discovery rule." Thus, a fraud action is timely if it is started within six years from the time claimant discovered the fraud, or six years from the time claimant "could with reasonable diligence have discovered [the fraud]." See N.Y.C.P.L.R. § 213.8. The discovery rule does not save the plaintiff's claim.
 
 
 [13]
 In determining whether New York courts currently recognize a claim based on an insurer's bad faith refusal to pay benefits, the district court may find instructive a recent decision from the Appellate Division. See Batas v. Prudential Ins. Co. of Am. 2001 WL 286902 (1st Dep't, Mar. 20, 2001). Significantly, all five sitting justices agreed that "an insured should have an adequate remedy to redress an insurer's bad faith refusal of benefits under its policy." Id. at *4. The majority found that such a claim was not implicated by the complaint in that case. See id. The dissenting opinion asserted that such a claim was raised in the case and set forth an analysis of the reasons that a tort claim for an insurer's bad faith refusal to pay benefits should be recognized generally in New York. The reasons detailed include the grossly unequal bargaining positions of health insurance companies and customers, the inability of most citizens to afford health care without insurance, the fact that denials of benefits by insurance companies often result in physical injuries to insured, and the need for damages to compensate for such injuries. See id. at *7-*12 (Saxe, J.J., dissenting in part); see also DeMarco v. Federal Ins. Co., 472 N.Y.S.2d 464, 466 (3rd Dep't, 1984) (recognizing a claim for bad-faith refusal to pay benefits in first-party insurance context). But see Rocanova, 612 N.Y.S.2d at 344 ("A complaint does not state a claim for compensatory or punitive damages by alleging merely that the insurer engaged in a pattern of bad-faith conduct."); New York Univ., 639 N.Y.S.2d at 289 ("To the extent that plaintiff alleges that defendants engaged in a 'sham' investigation those allegations merely evidence dissatisfaction with defendants' performance of the contract obligations.").