FOR PUBLICATION
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

FILED

NOV 24 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

DAVITA INC.,

  Plaintiff-Appellant,

  v.

VIRGINIA MASON MEMORIAL
HOSPITAL, FKA Yakima Valley Memorial
Hospital; YAKIMA VALLEY MEMORIAL
HOSPITAL EMPLOYEE HEALTH CARE
PLAN,

  Defendants-Appellees.

No.  19-35692

D.C. No. 2:19-cv-00302-BJR

OPINION

Appeal from the United States District Court
for the Western District of Washington
Barbara Jacobs Rothstein, District Judge, Presiding

Argued and Submitted October 8, 2020
Seattle, Washington

Before:  Susan P. Graber and William A. Fletcher, Circuit Judges, and Leslie E.
Kobayashi,* District Judge.

Opinion by Judge Graber

GRABER, Circuit Judge:

---

  *    The Honorable Leslie E. Kobayashi, United States District Judge for
the District of Hawaii, sitting by designation.

Defendant Virginia Mason Memorial Hospital administers its own group health plan, Defendant Yakima Valley Memorial Hospital's Employee Health Care Plan ("Virginia Mason's Plan" or "the Plan"). Among its many provisions, the Plan authorizes payments to providers of dialysis, a critical treatment for persons with end-stage renal disease ("ESRD"). Persons with ESRD become eligible for Medicare after three months of dialysis treatment, even if not otherwise eligible for Medicare. When, as here, both Medicare and another insurer have independent obligations to pay for a service such as dialysis, Congress—in the Medicare as Secondary Payer provisions ("MSP"), 42 U.S.C. § 1395y(b)—has decreed who pays first and who pays second. The MSP also imposes substantive requirements on group health plans, including by forbidding plans from taking into account an ESRD patient's eligibility for Medicare during the first thirty months of Medicare eligibility. Id. § 1395y(b)(1)(C).

Plaintiff DaVita, Inc., brought this action pursuant to the MSP's private cause of action, id. § 1395y(b)(3)(A), which authorizes suit when a plan fails to make a statutorily compliant primary payment. DaVita provides dialysis treatment to patients, including a beneficiary of Virginia Mason's Plan known as "Patient 1." DaVita alleges that Defendants reduced the payment amount for Patient 1's dialysis because of Medicare eligibility as soon as Patient 1 became eligible for Medicare, without waiting the mandatory thirty months. But the reduced payment

2

amount remained greater than the Medicare rate, so Medicare never made any secondary payments. The district court dismissed the complaint, holding that the MSP's private cause of action is available only when Medicare has made a payment.

Reviewing de novo and taking the allegations in the complaint as true, Daewoo Elecs. Am., Inc. v. Opta Corp., 875 F.3d 1241, 1246 (9th Cir. 2017), we hold that dismissal of the complaint on that ground was erroneous. The statutory text, congressional purpose, and regulatory clues make clear that Congress did not intend payment by Medicare to be a prerequisite to bringing a private cause of action under the MSP. The private cause of action encompasses situations in which a primary plan impermissibly takes Medicare eligibility into account too soon, even if Medicare has not made any payments. Accordingly, we vacate in large part and remand for further proceedings.

## BACKGROUND

### A.    ESRD and Medicare

More than 700,000 people in the United States have ESRD, also known as kidney failure. To survive, a person with ESRD requires either a kidney transplant or routine maintenance dialysis. 42 C.F.R. § 406.13(b); see also Kidney Disease Statistics for the United States, Nat'l Insts. of Health (December 2016), https://www.niddk.nih.gov/health-information/health-statistics/kidney-disease.

Dialysis acts as a substitute for a functioning kidney. The most common form of dialysis for persons with ESRD is hemodialysis. Id. As described by DaVita, during hemodialysis, "[a] dialysis machine removes blood from the body, filters it through an artificial kidney, and then returns the cleaned blood." "Traditional, in-center dialysis is administered to a patient three times a week for about four hours each session." Most persons with ESRD never receive a kidney transplant, so they receive regular dialysis for the remainder of their lives. Dialysis is expensive, costing tens of billions of dollars annually in the United States.

Congress responded to the critical need for dialysis and the high cost of treatment. When Congress created Medicare in 1965, the program encompassed only two categories of eligibility: age and disability. 42 U.S.C. § 426 (1965). But many persons with ESRD did not qualify for Medicare and could not afford dialysis on their own. In 1972, Congress expanded Medicare by making all persons diagnosed with ESRD eligible for Medicare, regardless of age or disability. 42 U.S.C. § 426-1. A person diagnosed with ESRD becomes eligible for Medicare three months after first beginning regular maintenance dialysis (or sometimes sooner if the person receives a kidney transplant). Id. § 426-1(b).

Medicare is not, of course, the sole provider of healthcare benefits. Many other sources—such as worker's compensation programs, tort-liability insurers, and group health plans—also provide healthcare benefits. When a patient is

4

covered by more than one program, which program must pay <u>first</u> can be a significant question.

Congress has allocated primary-payer responsibility between Medicare and other insurers through the MSP. For the 30 months following an individual's Medicare eligibility due to ESRD, a group health plan may not "take into account" the person's eligibility for Medicare. <u>Id.</u> § 1395y(b)(1)(C)(i). Following that 30-month period (33 months after treatment began), a group health plan may begin "paying benefits secondary to" Medicare. <u>Id.</u> § 1395y(b)(1)(C). In sum, for a person with ESRD who is covered by a group health plan, the plan is the sole payer during the first 3 months of dialysis; the plan is the primary payer and Medicare is the secondary payer during the 30-month coordination period; and the plan may be the secondary payer thereafter.

B.      Factual and Procedural History

Virginia Mason operates a nonprofit hospital in Yakima, Washington. Many hospital employees are eligible to enroll in Virginia Mason's Plan, which is an "employee benefit plan" within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA").

Virginia Mason's Plan provides varying rates of reimbursement for benefits depending on whether the beneficiary visits an "in-network" provider or an "out-of-network" provider. The Plan has a separate provision pertaining to

reimbursement for dialysis.  In many circumstances, the Plan pays for dialysis services the same way it pays for all other covered services:  "at applicable network or negotiated fee at in-network and out-of-network benefit levels."  But "[o]nce the member becomes, or is eligible to become, qualified for Medicare coverage for ESRD and Medicare becomes or is eligible to become the secondary payer for ESRD services, the Plan will pay claims for ESRD services at 125% of the then current Medicare allowable [rate] for ESRD Services."  DaVita alleges that, although the special reimbursement rate is higher than Medicare's reimbursement rate, the special reimbursement rate is significantly lower than the ordinary rates paid to both in-network and out-of-network providers.

Patient 1, a beneficiary of Virginia Mason's Plan who has ESRD, received regular dialysis treatment from DaVita.  For the first three months of treatment, when Patient 1 had not yet become eligible for Medicare, DaVita received "appropriate reimbursement" from the Plan's third-party claims administrator.  But beginning in the fourth month of treatment, when Patient 1 first became eligible for Medicare due to ESRD and when Medicare became the secondary payer, the Plan reimbursed DaVita at the special reimbursement rate described above.  The Plan paid that lower rate for 20 months.  DaVita alleges that Patient 1 then "switched from the Plan to Medicare for primary coverage for dialysis treatments," and the Plan apparently ceased all payments to DaVita.

6

DaVita brought this action, asserting a single claim pursuant to 42 U.S.C. § 1395y(b)(3)(A). DaVita alleges in part that, by immediately taking into account Patient 1's eligibility for Medicare, the Plan's ESRD-specific program violates the MSP's prohibition on taking into account an individual's eligibility for Medicare, id. § 1395y(b)(1)(C)(i).

As noted, the district court ruled that the MSP's private cause of action applies only when Medicare has made a payment. Because DaVita did not allege that Medicare had made a payment, the court dismissed the complaint for failure to state a claim. DaVita timely appeals.

## DISCUSSION

The parties dispute the scope of the MSP's private cause of action, 42 U.S.C. § 1395y(b)(3)(A). We find it useful to begin, as have other courts, with an overview of the MSP, in Part A, below. In Part B, we analyze the scope of the private cause of action, concluding that Congress did not intend payment by Medicare to be a prerequisite to suit. Finally, in Part C, we apply that holding to the allegations in this case.

### A. Overview of the MSP

The MSP provisions all are found in 42 U.S.C. § 1395y(b). Originally enacted in 1965, the provisions have expanded considerably in the intervening decades. We explore three aspects of the MSP's evolution: (1) its "secondary

7

payer" designation; (2) substantive requirements on group health plans and (3) enforcement mechanisms.

1.    Secondary-Payer Designation

The Medicare as Secondary Payer provisions, as the name suggests, designate Medicare as the secondary payer in certain circumstances when both Medicare and a non-Medicare entity have independent duties to pay for a covered person's healthcare costs.  The MSP itself does not impose a duty to pay on Medicare or on any other entity.  Instead, the MSP "presupposes an existing obligation (whether by statute or contract) to pay for covered items or services." Humana Med. Plan v. W. Heritage Ins. Co., 832 F.3d 1229, 1237 (11th Cir. 2016). Medicare's duty arises from statutory provisions that govern Medicare.  And a non-Medicare entity's duty arises from a separate legal source, such as a tort-insurance policy or a group health plan.

How the MSP designates Medicare as the secondary payer is less direct than one might expect; the statute does not contain a straightforward provision that the non-Medicare entity must pay first and that Medicare must pay second.  Instead, the MSP always has accomplished the same goal through two main clauses.  First, the MSP forbids payment by Medicare when another insurer has paid or is expected to pay.  42 U.S.C. § 1395y(b)(2)(A); accord, e.g., id. § 1395y(b)(1) (1984); id. § 1395y(b) (1965).  Second, the MSP requires all payments by

8

Medicare to be conditioned on reimbursement whenever Medicare discovers that another insurer has paid or should have paid. 42 U.S.C. § 1395y(b)(2)(B); accord, e.g., id. § 1395y(b)(1) (1984); id. § 1395y(b) (1965). Effectively, then, Medicare is the secondary payer and the other insurer is the primary payer.

Paragraph (2) of the present-day statutory text is titled "Medicare secondary payer." 42 U.S.C. § 1395y(b)(2). Subparagraph (2)(A), titled "In general," contains the necessary ingredients to accomplish the secondary-payer designation. Except as provided in subparagraph (2)(B), subparagraph (2)(A) forbids payment by Medicare when another insurer has paid or is expected to pay. Id. § 1395y(b)(2)(A).[1] Subparagraph (2)(B) authorizes payments by Medicare in

---

[1] Subparagraph (2)(A) states, in full:

> (A) In general
>
> Payment under this subchapter may not be made, except as provided in subparagraph (B), with respect to any item or service to the extent that—
>
> (i) payment has been made, or can reasonably be expected to be made, with respect to the item or service as required under paragraph (1), or
>
> (ii) payment has been made or can reasonably be expected to be made under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance.
>
> (continued)

9

certain circumstances, but all payments must be conditioned on reimbursement in the event that the Secretary of Health and Human Services discovers that another insurer should have paid. See id. § 1395y(b)(2)(B)(i) ("Authority to make conditional payment"); id. § 1395y(b)(2)(B)(ii) ("Repayment required"). Accordingly, as we previously have held, subparagraph (2)(A) designates Medicare the secondary payer and the other insurer the primary payer. See Parra v. PacifiCare of Ariz., Inc., 715 F.3d 1146, 1152 (9th Cir. 2013) (citing subparagraph (2)(A) specifically for the conclusion that "[t]he MSP makes Medicare insurance secondary to any 'primary plan' obligated to pay a Medicare recipient's medical expenses."); see also Humana, 832 F.3d at 1237 ("Paragraph (2)(A) alters the priority among already-obligated entities . . . ."); id. (referring to "the secondary-payer scheme created by paragraph (2)(A)"); Health Ins. Ass'n of Am., Inc. v. Shalala, 23 F.3d 412, 414 (D.C. Cir. 1994) ("Paragraph (2) . . . makes

---

> In this subsection, the term "primary plan" means a group health plan or large group health plan, to the extent that clause (i) applies, and a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance, to the extent that clause (ii) applies. An entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part.

Id. § 1395y(b)(2)(A).

10

Medicare the 'secondary' payer . . . ."); accord Mason v. Am. Tobacco Co., 346 F.3d 36, 38 (2d Cir. 2003).

As originally enacted in 1965, the MSP designated Medicare as the secondary payer solely with respect to state and federal worker's compensation laws and plans. 42 U.S.C. § 1395y(b) (1965). All other insurers, mainly tort-liability insurers and group health plans, remained off the hook. If Medicare and a private policy both covered a healthcare expense, the private insurer simply could decline to pay the expense until Medicare had paid first. The private insurers would pick up the tab for any remaining costs (provided, of course, that those additional costs were covered by the private insurance). Bio-Medical Applications of Tenn., Inc. v. Central States Se. & Sw. Areas Health & Welfare Fund, 656 F.3d 277, 278 (6th Cir. 2011).

In 1980, Congress responded to that costly arrangement. Congress expanded the reach of the MSP by designating Medicare as the secondary payer with respect to tort-liability insurance of all stripes: "an automobile or liability insurance policy or plan (including a self-insured plan)" and "no fault insurance." Pub. L. No. 96-499, 94 Stat. 2599 (Dec. 5, 1980); 42 U.S.C. § 1395y(b) (Dec. 1980). In 1981, Congress next designated Medicare as the secondary payer with respect to group health plans, but only for persons eligible to enroll in Medicare solely because of ESRD. Pub. L. No. 97-35, 95 Stat. 357 (Aug. 13, 1981); 42

11

U.S.C. § 1395y(b)(2) (Aug. 1981).  The next year, Congress extended Medicare's secondary-payer status with respect to group health plans to encompass some persons enrolled in Medicare due to age.  Pub. L. No. 97-248, 96 Stat. 324 (Sept. 3, 1982); 42 U.S.C. § 1395y(b)(3) (Sept. 1982).  And in 1986, Congress added the third category of Medicare eligibility:  disability.  Pub. L. No. 99-509, 100 Stat. 1874 (October 21, 1986); 42 U.S.C. § 1395y(b)(4) (Oct. 1986).  Thus, by 1986, the MSP—in its peculiar way—designated Medicare as the secondary payer with respect to nearly all insurers and nearly all categories of Medicare eligibility.

2.      Substantive Requirements for Group Health Plans

With respect to group health plans specifically, Congress went beyond merely giving Medicare secondary-payer status.  Originally, the MSP did not impose any substantive requirements on group health plans.  So far as the MSP was concerned, insurers were free to craft plan provisions that accounted for Medicare eligibility or that offered differing treatment to, for example, seniors or those diagnosed with ESRD.  In the late 1980s, Congress enlarged the scope of the MSP by enacting substantive requirements, generally prohibiting group health plans from "tak[ing] into account" a person's Medicare enrollment or eligibility and from offering differing benefits to working seniors or ESRD patients.  Pub. L. No. 101-239, 103 Stat. 2106 (Dec. 19, 1989); Pub. L. No. 99-509, 100 Stat. 1874 (October 21, 1986).

12

Those substantive "[r]equirements of group health plans" are now all found in paragraph (1). Id. § 1395y(b)(1). The first three subparagraphs impose substantive requirements with respect to the three categories of Medicare eligibility.[2] Subparagraph (1)(A) prohibits most group health plans from taking into account a beneficiary's entitlement to Medicare because of age, and it affirmatively requires plans to provide identical benefits to working seniors as to others. Id. § 1395y(b)(1)(A). Subparagraph (1)(B) generally prohibits large group health plans from taking into account a beneficiary's entitlement to Medicare because of disability. Id. § 1395y(b)(1)(B). Subparagraph (1)(C), which is most relevant here, contains two substantive prohibitions with respect to persons who have ESRD:

> A group health plan (as defined in subparagraph (A)(v))—
>
> (i) may not take into account that an individual is entitled to or eligible for benefits under this subchapter under section 426-1 of this title during the [30]-month period which begins with the first month in which the individual becomes entitled to benefits under part A under the provisions of section 426-1 of this title, or, if earlier, the first month in which the individual would have been entitled to benefits under such part under the provisions of section 426-1 of this title if the individual had filed an application for such benefits; and

---

[2] The substantive requirements are subject both to blanket exceptions, such as for religious orders, 42 U.S.C. § 1395y(b)(1)(D), and to subparagraph-specific exceptions, such as for small employers with respect to age-based eligibility, id. § 1395y(b)(1)(A)(ii). But most of the requirements apply broadly to many group health plans. Defendants have not claimed that any exception applies here.

(ii) may not differentiate in the benefits it provides between individuals having end stage renal disease and other individuals covered by such plan on the basis of the existence of end stage renal disease, the need for renal dialysis, or in any other manner[.]

Id. § 1395y(b)(1)(C).

3.    Enforcement Mechanisms

Similarly, Congress has strengthened the MSP's enforcement mechanisms over time. Congress originally incentivized compliance solely through mild tax consequences. 42 U.S.C. § 162(h) (1981). Beginning in 1984, though, it added a governmental cause of action, allowing the United States to bring suit to recover its payments when another insurer should have paid. Pub. L. No. 98-369, 98 Stat. 494 (July 18, 1984). Finally, in 1986, Congress added a private cause of action, allowing a suit for double damages whenever an insurer failed to pay in accordance with the MSP's provisions. Pub. L. No. 99-509, 100 Stat. 1874 (October 21, 1986); 42 U.S.C. § 1395y(b)(5) (1986). In that same enactment, Congress authorized the government, too, to recover double damages in some circumstances. Pub. L. No. 99-509, 100 Stat. 1874 (October 21, 1986); 42 U.S.C. § 1395y(b)(4)(A)(iii) (Oct. 1986); see also Pub. L. No. 101-239, 103 Stat. 2106 (Dec. 19, 1989) (expanding the scope of the double-damages provision for the governmental cause of action); 42 U.S.C. § 1395y(b)(2)(B)(ii) (Dec. 1989).

B.    Analysis

14

We next consider whether payment by Medicare is a prerequisite to suit pursuant to the private cause of action, 42 U.S.C. § 1395y(b)(3)(A). We examine (1) the statutory text, (2) congressional purpose, and (3) regulatory clues.

1.      Statutory Text

"We begin, as usual, with the statutory text." Maslenjak v. United States, 137 S. Ct. 1918, 1924 (2017). The "Private Cause of Action" provision states, in full:

> There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).

42 U.S.C. § 1395y(b)(3)(A).

The cause of action is thus available whenever a primary plan fails to take a specific action: paying in accordance with two provisions. Nothing in the statutory text concerns an act or omission by Medicare. Indeed, the text does not mention Medicare at all; it merely authorizes suit whenever a primary plan fails to make an appropriate payment. Nor would it have been hard for Congress to include payment by Medicare as an element. For example, Congress could have added "when the Secretary has made a conditional payment" or "to recover payment made under this subchapter." Congress did exactly that in defining the scope of the government's cause of action, which begins: "In order to recover

15

payment made under this subchapter for an item or service, the United States may bring an action . . . ." 42 U.S.C. §1395y(b)(2)(B)(iii) (emphasis added); see Russello v. United States, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks and brackets omitted)). We therefore deem Congress' omission in § 1395y(b)(3)(A) of a requirement for Medicare to have paid to be deliberate.

Defendants nevertheless insist that Congress intended to require payment by Medicare as a prerequisite to suit. Defendants urge us to infer that prerequisite from the statutory text authorizing suit whenever a primary plan fails to pay "in accordance with paragraphs (1) and (2)(A)." 42 U.S.C. § 1395y(b)(3)(A). According to Defendants, the only way to make sense of the text is to conclude that Congress intended payment by Medicare as a prerequisite to suit. We disagree.

"Determining when a primary plan violates paragraph (1) is easy." Bio-Medical, 656 F.3d at 285. As we described above, paragraph (1) contains substantive prohibitions that apply to group health plans. So, in order to pay in accordance with paragraph (1), a group health plan must not violate those prohibitions. For example, pertinent here, subparagraph (1)(C) bars a group health

16

plan from taking into account Medicare eligibility due to ESRD. A payment by a group health plan that took into account a person's eligibility for Medicare due to ESRD would not be in accordance with paragraph (1). Nothing about § 1395y(b)(3)(A)'s reference to paragraph (1) suggests that Medicare must pay.

Defendants direct us instead to the provision's reference to a plan's failure to pay in accord with subparagraph (2)(A). That provision forbids <u>Medicare</u> from making payments when another plan has paid or is expected to pay; at first glance, it does not affirmatively direct primary plans to do anything. The Sixth Circuit aptly summarized:

> How can a primary plan fail to make a payment in accordance with subparagraph (2)(A), if that subparagraph only instructs when Medicare, and not primary plans, may or may not make payments?

<u>Bio-Medical</u>, 656 F.3d at 286 (emphasis omitted).

The answer, in our view, is not complicated. As we discussed above, and as we held in <u>Parra</u>, 715 F.3d at 1152, subparagraph (2)(A) assigns secondary-payer status to Medicare and therefore necessarily <u>assigns primary-payer status to the private insurer</u>. Indeed, the original version of the cause-of-action provision made that implication explicit, referring to the various insurance types, including group health plans, as having been "made a primary payer" by the predecessor clauses to current subparagraph (2)(A). 42 U.S.C. § 1395y(b)(5) (Oct. 1986). In other words, the functional effect of subparagraph (2)(A) on a private insurer is to

17

require the private insurer to be the primary payer. Therefore, a payment in accordance with subparagraph (2)(A) merely requires payment consistent with the insurer's primary-payer status.

Applying that insight here, any mystery about the scope of the private right of action falls away. Paragraph (1) imposes substantive requirements on group health plans, thereby requiring benefit calculations consistent with those requirements. Subparagraph (2)(A) designates the private insurer, in prescribed circumstances, as the primary payer, thereby requiring payment before Medicare has paid (or requiring reimbursement if Medicare has paid already). A plan's payment must comport with both the substantive requirements of paragraph (1) and the primary-payer requirement of subparagraph (2)(A).

Notably, a plan's failure to abide by those requirements does not always cause Medicare to make a conditional payment. If a plan refuses to cover persons with ESRD, for example, in violation of paragraph (1), then Medicare might make a payment. But if, as alleged here, a plan violates paragraph (1) yet pays more than the Medicare rate, then Medicare will not make any additional payments.

Similarly, if a plan fails to pay consistent with its assigned primary-payer status—for example, by declining to pay until after Medicare has paid or by paying an amount that subtracts an amount equal to an expected Medicare payment—then that failure will not necessarily cause Medicare to make a payment. Indeed,

18

regulations generally forbid Medicare from making payments when a group health plan has a duty to pay. 42 C.F.R. § 411.165(b); cf. 42 U.S.C. § 1395y(b)(2)(B)(i) (authorizing conditional payments when a tort-liability insurer is not reasonably expected to pay).

In other words, a group health plan's failure to pay consistent with its substantive obligations or its failure to pay consistent with its primary-payer status sometimes results in payment by Medicare and sometimes does not result in payment by Medicare. But the private cause-of-action provision looks solely to the group health plan's actions, not to the downstream effect of those actions. Whether a "primary plan . . . fails to provide for primary payment (or appropriate reimbursement) in accordance with" two requirements does not ask whether Medicare has made a payment. 42 U.S.C. § 1395y(b)(3)(A). In our view, then, the statutory text does not support Defendants' argument that Medicare must make a payment.

We acknowledge that the only other circuit court to have examined the pertinent text in detail has reached the opposite conclusion. In a thoughtful analysis, the Sixth Circuit adopted a different reading of the relevant provision's reference to subparagraph (2)(A). DaVita, Inc. v. Marietta Mem'l Hosp. Empl. Health Benefit Plan, 978 F.3d 326, 337–40 (6th Cir. 2020); Bio-Medical, 656 F.3d at 284–87. Overlooking the functional effect of subparagraph (2)(A), the court

19

reasoned, instead, that Congress must have intended the reference to subparagraph (2)(A) to require payment by Medicare. Marietta, 978 F.3d at 337–38; Bio-Medical, 656 F.3d at 286. According to the Sixth Circuit, "the only way that a primary plan can fail to act in accordance with [subparagraph (2)(A)] is by failing to make payments or appropriate reimbursements to a provider and thus triggering the remission of a conditional payment by Medicare." Marietta, 978 F.3d at 337 (emphasis added).

We respectfully disagree. As discussed above, a plan's failure to pay consistent with its obligations only sometimes triggers payment by Medicare. Moreover, the statutory provisions concerning conditional payments by Medicare are found in subparagraph (2)(B), not subparagraph (2)(A). Subparagraph (2)(B) is titled "Conditional payment"; subparagraph (2)(B)(i) authorizes conditional payments by Medicare; and subparagraph (2)(B)(ii) requires a primary plan to make an appropriate reimbursement. If Congress had referenced those statutory provisions directly in the cause-of-action provision, we might infer a prerequisite of payment by Medicare. But Congress did not refer to those provisions directly; instead, it required only that primary plans pay in accordance with paragraphs (1) and (2)(A). It is true that subparagraph (2)(A) states that Medicare may not make payments except as provided in subparagraph (2)(B). But if the cause-of-action provision's aim were to require a payment by Medicare in order to sue, then why

20

refer to subparagraph (2)(A) at all? The only function that subparagraph (2)(A) serves with respect to Medicare is to <u>prohibit</u> Medicare payments. We therefore part ways with the Sixth Circuit's analysis and conclude, instead, that a private insurer fails to pay in accord with subparagraph (2)(A) whenever it pays inconsistently with its primary-payer status. No payment by Medicare is required.

Returning to the text of the cause-of-action provision, we emphasize a subtle but important point. The statute authorizes suit whenever a plan "fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)." 42 U.S.C. § 1395y(b)(3)(A). The plan must <u>pay</u> in accord with both requirements (it must pay the same for Medicare enrollees and it must pay first).[3] The two requirements form an obligation on a group health plan to make a statutorily compliant payment. If the payment does not comply, then the plan has failed to pay in accordance with that obligation. In other words, as

---

[3] The prepositional phrase "in accordance with paragraphs (1) and (2)(A)" clearly connects to "provide for primary payment," not "fails." Congress placed the prepositional phrase immediately after the phrase "provide for primary payment (or appropriate reimbursement)," strongly suggesting that the "in accordance with" phrase modifies the payment requirement, not the failure. <u>See, e.g.</u>, <u>Barnhart v. Thomas</u>, 540 U.S. 20, 26–27 (2003) (describing and applying the rule of the last antecedent). Moreover, the meaning of the prepositional phrase resolves any doubt. One cannot "fail" "in accordance with" something; "in accordance with" means "in agreement or harmony with" or "in conformity to." <u>See</u> <u>accordance</u>, <u>Oxford English Dictionary</u> (3d ed. 2011), https://www.oed.com/view/Entry/1170?redirectedFrom=accordance#eid (last visited Nov. 13, 2020) (def. 2b ("in accordance with"))

explained in more detail below, a <u>failure</u> to pay in accord with two requirements occurs whenever a payment violates <u>either</u> of the provisions. The private right of action thus attaches if a plan <u>either</u> fails to pay in accord with paragraph (1) <u>or</u> fails to pay in accord with subparagraph (2)(A). A plan's payment need not fail on both scores; a noncompliant payment, for either reason, triggers the right to sue.

Formal logic supports that interpretation. Known as one of De Morgan's laws, the principle holds that the condition of "not (A and B)" is satisfied if <u>either</u> "not A" <u>or</u> "not B." Irving M. Copi & Carl Cohen, <u>Introduction to Logic</u> 331–32 (14th ed. 2011); Peter Smith, <u>An Introduction to Formal Logic</u> 61, 100 (2003); <u>see also</u> R.L. Goodstein, <u>Boolean Algebra</u> 6–7 (Dover ed. 2007). Courts have applied De Morgan's laws in interpreting statutes. <u>E.g.</u>, <u>Schane v. Int'l Broth. of Teamsters Union Local No. 710 Pension Fund Pension Plan</u>, 760 F.3d 585, 589–90 (7th Cir. 2014); <u>United States v. One 1973 Rolls Royce</u>, 43 F.3d 794, 814–15 (3d Cir. 1994). Of course, statutory interpretation is not a rigid mathematical exercise; when considering De Morgan's laws, "[c]ontext matters." <u>Schane</u>, 760 F.3d at 590; <u>see generally</u> Lawrence M. Solan, <u>The Language of Judges</u> 45–63 (1993) (discussing the principles at some length). But the context here decisively confirms our interpretation.

The principle is best illustrated by example where, as here, the two clauses establish separate requirements that govern an action. If a hypothetical statute

22

required payment (1) by the end of the month and (2) by cashier's check, and the statute provided that payment will be rejected if the debtor fails to pay in accordance with paragraphs (1) and (2), no one would contend that a timely personal check or an untimely cashier's check must be accepted. Or consider a hiring statute that (1) bars sex discrimination and (2) bars religious discrimination. A failure to hire in accord with paragraphs (1) and (2) occurs whenever the employer engaged in <u>one</u> of those forms of discrimination. No one would contend that a failure occurs only if the employer engaged in <u>both</u> sex discrimination and religious discrimination. This understanding also comports with ordinary speech. If a teacher sternly tells a student to "sit down and be quiet," and threatens detention if the student fails to sit down and be quiet, the whole class knows that the student must comply with <u>both</u> instructions to avoid detention. Sitting while making noise won't cut it.

The MSP's private cause-of-action provision operates in the same way. Paragraph (1) imposes substantive requirements on group health plans, and subparagraph (2)(A) requires the private insurer to pay first. A plan fails to pay in accordance with those provisions <u>either</u> by violating the substantive provisions in paragraph (1) <u>or</u> by failing to pay consistently with its primary-payer status.

Careful study of the private cause-of-action provision also confirms that interpretation. This case involves a suit against a group health plan. But the cause-

23

of-action provision also encompasses a tort-liability insurer's failure to pay. The provisions of paragraph (1) apply solely to group health plans, so it is impossible for a tort-liability insurer to "fail" to pay in accordance with paragraph (1). Courts nevertheless have allowed an action to lie for any failure by a tort-liability insurer to pay in accordance with subparagraph (2)(A) only. E.g., Mich. Spine & Brain Surgeons, PLLC v. State Farm Mut. Auto. Ins. Co., 758 F.3d 787, 790–93 (6th Cir. 2014); see Humana, 832 F.3d at 1236–37 (noting that "[p]aragraph (1) regulates group health plans and is not at issue in this case" and nevertheless holding that "a primary plan 'fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraph[] . . . (2)(A)'" (ellipsis and second alteration by Humana)); Glover v. Liggett Grp., Inc., 459 F.3d 1304, 1308 (11th Cir. 2006) (per curiam) (analyzing the cause of action in a tort-based suit by reference solely to subparagraph (2)(A), and holding that the statute "creates a private cause of action for double damages 'in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with . . . (2)(A).'" (ellipsis by Glover) (emphasis omitted) (quoting 42 U.S.C. § 1395y(b)(3)(A))); see also In re Avandia, 685 F.3d 353, 359 (3d Cir. 2012) (analyzing a private cause of action brought against a self-insured company without regard to paragraph (1)'s requirements and holding that the action may be brought notwithstanding the lack of a violation of paragraph (1)). In other words, for one of the two categories of

24

insurers (tort-liability insurers), a failure to pay in accordance with just one of the subparagraphs suffices.  In our view, Congress clearly intended the same result with respect to the other category of insurers (group health plans).

Finally, we note that the Sixth Circuit began its analysis with the opposite assumption:  that the cause of action requires two separate failures, a failure to pay in accord with paragraph (1) and a failure to pay in accord with subparagraph (2)(A).  Marietta, 978 F.3d at 337; Bio-Medical, 656 F.3d at 285.  Because of that assumption, the Sixth Circuit was unable to make sense of the statute; the court thus abandoned the approach, determining instead to "consider paragraphs (1) and (2)(A) collectively, rather than individually."  Marietta, 978 F.3d at 337 (quoting Bio-Medical, 656 F.3d at 286).  For the reasons that we have explained above, we think that Congress intended to permit a private action if an insurer fails to abide by either obligation.

In sum, paragraph (1) provides the substantive obligations of a group health plan, and subparagraph (2)(A) designates a plan as the primary payer in certain circumstances.  Those two provisions, together, create an obligation on a plan to make a primary payment in some circumstances, and the statute allows suit whenever a plan fails to meet its obligation in either respect.

Our interpretation yields a tidy result.  For group health plans, paragraph (1) requires payment according to certain substantive terms, such as not taking into

25

account Medicare eligibility when calculating the payment amount; and subparagraph (2)(A) merely requires primary payment, that is, payment before Medicare pays or reimbursement if Medicare already paid. In cases like this one, where the plan made a primary payment, the plan arguably did not fail to pay in accordance with subparagraph (2)(A). But the plan's alleged violation of paragraph (1) nevertheless gives rise to a claim.

Similarly, one can imagine the reverse situation, in which the group health plan's terms and calculations are proper, but the plan declines to pay on the improper basis that Medicare must pay first (or the plan waits for Medicare to pay first and then pays the balance only). In that situation, the plan arguably did not fail to pay in accordance with paragraph (1), because the plan's terms and calculations are proper; but the plan clearly failed to pay in accordance with subparagraph (2)(A), because it made no payment (or a secondary payment only). The plan's violation of subparagraph (2)(A) would give rise to a cause of action. Similarly, as noted above, a tort-liability insurer cannot fail to pay in accord with paragraph (1), because it does not apply; but a tort-liability insurer's refusal to assume primary-payer status, contrary to subparagraph (2)(A), would give rise to a cause of action. It may seem implausible today that a plan would blatantly contradict the MSP by asserting that Medicare must pay first. But we note that, for

26

decades, the sole purpose of the MSP was to require private plans to pay first—a requirement that insurers resisted and that Congress struggled to enforce.

Our reading of the cause-of-action provision does not require payment by Medicare as a prerequisite to suit. In that sense, the reading is broader than a rule that requires payment by Medicare. But our interpretation is, in at least one way, more limited than the reading adopted by some courts. E.g., MSP Recovery, LLC v. Allstate Ins. Co., 835 F.3d 1351, 1358 (11th Cir. 2016). Specifically, our reading does not convert ordinary billing disputes into MSP claims giving rise to double damages. If a plan denies payment for any reason other than those reasons forbidden by paragraphs (1) and (2)(A), then no MSP claim is available. For example, no MSP claim would be available if the insurer declines to pay because of a good-faith assertion[4] that the beneficiary has reached the plan's maximum payments, that the claim is fraudulent, that the beneficiary failed to obtain pre-approval for a service, that the beneficiary's coverage had expired, and so on. Those disputes would require resolution through ordinary ERISA channels or state-law contract claims. An MSP claim, and its allowance of double damages,

---

[4] A bad-faith assertion might require a different result. If a plan raised a bad-faith defense to mask its violation of the MSP provisions, an MSP action might be valid. Of course, the plaintiff would have the burden to show that the real reason for the denial was one of the MSP-forbidden grounds. Cf. Manning v. Utils. Mut. Ins. Co., 254 F.3d 387, 389–90 (2d Cir. 2001) (reversing the district court's dismissal of a claim that the insurer had denied benefits in bad faith).

would be available only if the plan declined to pay for a reason forbidden by either paragraph (1) or (2)(A).

2. The Purpose of the Statute

"In determining a statutory provision's meaning, we may consider the purpose of the statute in its entirety, and whether the proposed interpretation would frustrate or advance that purpose." Brower v. Evans, 257 F.3d 1058, 1065 (9th Cir. 2001) (internal quotation marks omitted). As we explain below, the MSP's purpose strongly supports our interpretation of the statutory text.

There is no dispute that "the overarching statutory purpose" of the MSP provisions is to "reduc[e] Medicare costs." Zinman v. Shalala, 67 F.3d 841, 845 (9th Cir. 1995). Indeed, until the late 1980s, the sole function of the statutory provisions was to save Medicare money. Those versions of the MSP contained only provisions requiring plans to make primary payments, that is, to pay before Medicare.

But beginning in the late 1980s, Congress added many provisions that go well beyond simply requiring plans to make primary payments. Indeed, nearly all of the provisions in what is now paragraph (1) protect persons from differing treatment by group health plans. For example, for most persons enrolled in Medicare—whether due to age, disability, or ESRD—group health plans generally may not take into account Medicare enrollment and must provide benefits identical

28

to those benefits received by everyone else. 42 U.S.C. § 1395y(b)(1)(A)(i)-(ii) & (B)(i) & (C)(i). The equal-treatment provisions apply whether or not Medicare even covers the particular item or service. The broader scope of the MSP provisions is clearer still with respect to persons diagnosed with ESRD. During the 30-month coordination period, plans may not take into account Medicare eligibility, even if the person is not in fact enrolled in Medicare. Id. § 1395y(b)(1)(C)(i). Moreover, wholly apart from Medicare enrollment or eligibility, plans may not offer differing benefits to persons with ESRD. Id. § 1395y(b)(1)(C)(ii).

Those provisions go well beyond protecting the Medicare Trust Fund. If Congress' aim were solely to protect the fisc, then Congress could have required that group health plans not reduce benefits in a way that caused Medicare to pay, or it could have limited the protections to items or services covered by Medicare. But Congress did much more: If a beneficiary has a "Cadillac plan," for example, it must remain a Cadillac plan even if the beneficiary enrolls in Medicare. Plans must continue coverage of all items and services—even those not covered by Medicare—despite the fact that coverage of those items and services could not possibly affect Medicare's coffers. And plans may not treat persons with ESRD differently even if they are not enrolled in Medicare. Notably, some persons with ESRD never go on Medicare, and nearly everyone with ESRD is ineligible for

Medicare during their first three months of treatment. 42 U.S.C. § 426-1(b)(1)(A).

Requiring payments by group health plans for persons who are not enrolled in

Medicare also could not affect Medicare's funds.

In sum, the purpose of the MSP today is twofold: to protect the fisc <u>and</u> to

provide equal treatment to certain categories of persons. Subparagraph (2)(A)

aims to protect the fisc by assigning primary-payer status to private insurers, and

paragraph (1) contains the equal-treatment provisions. The private cause of action

refers to both provisions. Consideration of congressional purpose thus strongly

supports our interpretation, which gives effect to both congressional purposes—

protecting the fisc <u>and</u> requiring equal treatment. Notably, Defendants'

interpretation advances only one of those purposes, by blessing blatantly unequal

treatment so long as that mistreatment does not directly harm the fisc.[5]

_____

[5] Nor does consideration of indirect harm to the fisc aid Defendants. If private plans greatly reduced benefits to Medicare enrollees but still paid enough to prevent payment by Medicare, some of those enrollees might drop their private plans and rely on Medicare alone, thus saving the cost of their premiums but harming Medicare eventually. Viewed in that light, the equal-treatment provisions could be said to provide <u>indirect</u> protection for Medicare's funds. One could accordingly view the equal-treatment provisions as simply an expression of Congress' sole purpose of protecting the fisc, albeit indirectly.

That line of reasoning fails to account for the equal-treatment provisions that apply to persons not enrolled in Medicare. But even overlooking that detail, the argument still fails on its own terms. If the equal-treatment provisions provide
(continued)

We acknowledge that some of our sister circuits have taken a narrower view of the MSP's purpose, for example, stating that "[t]he sole interest of Congress, as far as the statute discloses, was to provide that Medicare would not have to pay ahead of private carriers in certain situations." Baptist Mem'l Hosp. v. Pan Am. Life Ins. Co., 45 F.3d 992, 998 (6th Cir. 1995) (emphasis added); see also Harris Corp. v. Humana Health Ins. Co. of Fla., Inc., 253 F.3d 598, 605 (11th Cir. 2001) (per curiam) ("[T]he MSP statute was designed only to lower Medicare costs."); Perry v. United Food & Com. Workers Dist. Unions 405 & 442, 64 F.3d 238, 243 (6th Cir. 1995) (stating that Congress enacted the MSP "in order to lower Medicare costs"); Glatthorn v. Indep. Blue Cross, 34 F. App'x 420, 422 (3d Cir. 2002) (unpublished) ("Congress enacted the MSP to cut costs in the Medicare program."). Some decisions also have stated that the private cause-of-action provision reflects that supposedly sole purpose. See, e.g., Stalley v. Catholic Health Initiatives, 509 F.3d 517, 524 (8th Cir. 2007) ("[T]he apparent purpose of the [private cause of action] is to help the government recover conditional

---

indirect protection of the fisc, then allowing rigorous enforcement of those provisions (even when there is no direct harm to the fisc) has the effect of protecting Medicare's funds. So even if we assume that Congress' sole concern was reducing Medicare's costs, our interpretation nevertheless advances that cause. In fact, by allowing suit in instances of both direct and indirect threats to Medicare, our interpretation protects Medicare's funds better than Defendants' interpretation would, because Defendants' narrow interpretation permits suit only in cases of direct harm.

31

payments from insurers or other primary payers."); Manning, 254 F.3d at 396 ("The history of the MSP legislation is consistent with our view that the private right of action was created to save money for the Medicare system."); id. at 391–92 ("Congress has authorized a private cause of action and double damages against entities designated as primary payers that fail to pay for medical costs for which they were responsible, which are borne in fact by Medicare."); Harris Corp., 253 F.3d at 605 n.5 (agreeing with other courts that "the fiscal integrity of the Medicare program must be in jeopardy in order for the private cause of action to exist"); Perry, 64 F.3d at 243 (stating that when the Medicare "program's fiscal integrity is not threatened, . . . the MSP statute does not apply").

We decline Defendants' invitation to infer, from Congress' purportedly "sole" purpose of protecting the fisc, an intent by Congress to require payment by Medicare as a prerequisite to bringing a private action. Most fundamentally, although we agree that protecting the fisc is the MSP's overarching goal, we disagree that Congress had no other aims. As described in detail above, many of the substantive requirements in paragraph (1) go far beyond protecting Medicare's funds. None of the cases just cited considered the substantive requirements of paragraph (1), so it is not surprising that those courts focused on the MSP's main objective. We remain convinced that Congress' purpose was dual: to protect the fisc and to require equal treatment in some circumstances.

Nor did those decisions, in opining on the scope of the private cause-of-action provision, examine the provision's key text, which allows a suit whenever a primary plan fails to pay "in accordance with paragraphs (1) and (2)(A)." 42 U.S.C. § 1395y(b)(3)(A). As described above, close analysis of that text reveals no intent by Congress to require payment by Medicare as a prerequisite to private suit. To the extent that statements in the other cases suggest that we should infer a requirement that Medicare must make a payment before a private cause of action arises, we are not persuaded.

In enacting the MSP, Congress sought to save Medicare money, and it also sought to require equal treatment by group health plans in some circumstances. Section 1395y(b)(3)(A) reflects those dual purposes by allowing suit both in circumstances that threaten Medicare's funds and in circumstances in which a group health plan impermissibly treats beneficiaries unequally. Consideration of congressional purpose thus supports our interpretation of the cause of action.

3.    Regulatory Clues

Finally, we consider whether regulatory documents shine any light on the scope of the private cause of action. We find most illuminating a rulemaking in 1989, found at 54 Fed. Reg. 41,718. In response to a proposed rule on when Medicare would make payments, some commenters had requested that Medicare make conditional payments sooner if a primary plan declined to pay. 54 Fed. Reg.

33

41,718. The agency responded that Medicare did not want to assume that financial burden. The agency noted, as an additional reason for Medicare to decline to pay earlier, that Congress had created the private cause of action "if a responsible third party fails to pay primary benefits." Id. In short, the agency stated that, even if Medicare had not paid, private parties nevertheless could sue. We decline to give this passage, made in response to comments on a different issue, undue weight. But it is noteworthy that, from the beginning, the agency interpreted the private cause of action as not requiring payment by Medicare.

Defendants' regulatory citations do not advance the analysis. Title 42 C.F.R. § 411.24(c)(i) defines the damages available in a suit by the government as limited to the payment made by Medicare. That definition fully accords with the statutory text of the governmental cause of action, which is limited expressly to recovery of amounts spent by the government. 42 U.S.C. § 1395y(b)(2)(B)(iii). The regulation neither mentions the private cause of action nor purports to define the damages available under the separate statutory provision defining the private cause of action.

Defendants' other two citations, the MSP Manual and 42 C.F.R. § 411.161(b)(2), include examples of actions by primary plans that violate the MSP. Defendants point to a few examples that affect Medicare's funds. But both documents contain plenty of examples of nonconformance that do not affect

Medicare's funds, such as a private plan's charging a beneficiary higher premiums. MSP Manual, Ch. 1, § 70.4.A; 42 C.F.R. § 411.161(b)(2)(ii). More to the point, examples of nonconformance do not answer the key question: which types of nonconformance give rise to a private cause of action.

In sum, to the extent that the regulatory documents relate to the scope of the private cause of action, they support our interpretation that payment by Medicare is not a prerequisite to suit.

### 4. Summary

The statutory text, congressional purpose, and regulatory clues all point in the same direction: Congress intended the private cause of action to encompass suits resulting from statutorily noncompliant payments by primary plans. Payment by Medicare is not a prerequisite to suit.

### C. Result in This Case

For the first 20 months of Patient 1's eligibility for Medicare due to ESRD, Patient 1 was a beneficiary of Virginia Mason's Plan. DaVita alleges that, during that period, Defendants paid a lower rate for dialysis solely because of Patient 1's eligibility for Medicare, in violation of 42 U.S.C. § 1395y(b)(1)(C). The district court dismissed the complaint with respect to that 20-month period because Medicare had not made a payment. Because we hold that payment by Medicare is not a prerequisite to suit, we vacate that portion of the district court's judgment and

35

remand for further proceedings. We do not reach any of the alternative arguments raised by the parties. See Golden Gate Hotel Ass'n v. City & Cnty. of San Francisco, 18 F.3d 1482, 1487 (9th Cir. 1994) ("As a general rule, 'a federal appellate court does not consider an issue not passed upon below.'" (quoting Singleton v. Wulff, 428 U.S. 106, 120 (1976))). On remand, the district court may address those arguments in the first instance.

After the first 20 months, Patient 1 dropped his or her coverage under Virginia Mason's Plan. Patient 1 ceased to be a beneficiary of Virginia Mason's Plan, and Medicare became Patient 1's primary insurer. The MSP designates Medicare as the secondary payer for the first 30 months of Medicare eligibility. Had Patient 1 stayed enrolled in Virginia Mason's Plan, the Plan would have been the primary payer for 10 more months. As the district court held, the Plan clearly was not a "primary plan" during those 10 months, because Patient 1 was not a beneficiary of the Plan. DaVita's theory is that it nevertheless may seek damages for non-payment during those 10 months because, according to DaVita's briefing to us, the Plan's reduced payments during the preceding 20 months caused Patient 1 to drop coverage under the Plan.

We conclude that the complaint fails to allege causation plausibly. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). If the reduced payments caused Patient 1 to drop coverage, then Plaintiff could have so alleged. Instead, the complaint only

36

asserts generally that the reduced-payment scheme "incentivizes" persons to drop coverage, and it alleges that Patient 1 dropped coverage. The complaint fails to tie those two allegations sufficiently together in any plausible way.

In the absence of a direct allegation of causation, we do not find the inference of causation plausible in light of the other allegations. So far as the complaint alleges, the Plan did not change Patient 1's benefits in any way other than the amount that it paid the dialysis provider: no increased premiums, deductibles, or co-payments, or any other reduction in benefits that would be obvious to a beneficiary. Indeed, there is no allegation that Patient 1 was even aware of the reduction in payments from the Plan to the provider. If DaVita had billed Patient 1 for the balance or threatened to do so, causation might be plausible. But DaVita has not alleged that it did either one of those things. In other words, the Plan's reduced payments for dialysis could have caused Patient 1 to leave the Plan only if Patient 1 noticed the change in payment amount and became concerned about the theoretical possibility that DaVita would bill him or her for the balance (even though DaVita had not done so for 20 months). The complaint contains neither a straightforward allegation of causation nor any allegation suggesting that the reduced payments caused Patient 1 to drop coverage.

In sum, after Patient 1 dropped coverage under the Plan for a reason unconnected to Defendants' obligations under the MSP, Patient 1 ceased to be a

beneficiary of the Plan, and the Plan had no obligation to pay—first, second, or at all.  We therefore affirm the district court's dismissal with respect to the 10-month period after Patient 1 dropped coverage under Virginia Mason's Plan.

**AFFIRMED in part, VACATED in part, and REMANDED.**  The parties shall bear their own costs on appeal.